**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**LINDSEY DEHART, individually and on behalf of all others similarly situated,**

**Plaintiff,**

**v.**

**DILLON COMPANIES, LLC (d/b/a KING SOOPERS FUEL CENTER, KING SOOPERS, INC., KING SOOPERS, and CITY MARKET), and HF SINCLAIR CORPORATION,**

**Defendants.**

**CIVIL ACTION NO. 1:26-cv-00330**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Lindsey DeHart ("Plaintiff"), through her undersigned counsel, individually and on behalf of all others similarly situated, files this Class Action Complaint ("Complaint") against Defendants Dillon Companies, LLC d/b/a King Soopers Fuel Center, King Soopers, Inc., King Soopers, and City Market ("King Soopers"), and HF Sinclair Corporation ("Sinclair") (collectively, "Defendants"), seeking all available remedies under the Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq.*, and common law, based upon the causes of action set forth below. In support hereof, Plaintiff alleges as follows:

## INTRODUCTION

1. This action arises from Defendants' negligent, reckless, and unsafe distribution and sale of motor fuel that was represented as unleaded gasoline but was, in fact, contaminated with diesel fuel, therefore causing widespread and immediate economic damages to consumers throughout the State of Colorado.

2. The contamination involved a breakdown in fuel quality control and distribution affecting multiple retailers. Specifically, unleaded regular and plus grade gasoline that was

contaminated with diesel fuel was loaded from a third-party supplier terminal operated by HF Sinclair Corporation ("Sinclair") in Henderson, Colorado, into transport vehicles, and was subsequently delivered to retailers up and down the Front Range in Colorado.

3. Petroleum marketers estimate that at least 400,000 gallons of fuel may have been affected.[1]

4. At gas stations operated and/or branded by Dillon Companies, LLC d/b/a King Soopers Fuel Center, King Soopers, Inc., King Soopers, and City Market ("King Soopers"), unleaded regular and plus grade gasoline was improperly mixed with diesel fuel and sold to unsuspecting consumers. King Soopers sold this contaminated fuel for use in gasoline-powered vehicles to consumers during the time period from approximately January 7, 2026 through January 8, 2026. King Soopers has since released a list identifying at least thirteen (13) locations that negligently and recklessly sold contaminated gasoline.[2]

5. Public reports and consumer complaints indicate that similar contamination incidents occurred at gas stations operated by other retailers in Colorado during and around the same time period, including Defendant Sinclair, Circle K Stores, Inc. ("Circle K"), Safeway, Inc. ("Safeway"), Costco Wholesale Corporation ("Costco"), and Murphy Oil USA, Inc. d/b/a Murphy Express ("Murphy Express") (collectively, "Retailers").[3] Plaintiff anticipates that upon further

---

[1] Steve Staeger, Rhea Jha & Angela Case, *More than 400 Complaints Filed After Multiple Colorado Gas Stations Received Contaminated Fuel*, 9News (last updated Jan. 13, 2026, at 10:35 p.m. MT), https://www.9news.com/article/news/local/colorado-news/state-agency-investigating-colorado-gas-stations-contaminated-fuel/73-5a935c3a-50bf-40e4-9ede-3167d7237f92.
[2] Robert Garrison, *Here's When and Where Denver Area Gas Stations Likely Sold Contaminated Gas*, Denver7 (last updated Jan. 12, 2026, at 6:55 p.m. MT), https://www.denver7.com/news/local-news/heres-when-and-where-denver-area-gas-stations-likely-sold-contaminated-gas.
[3] *See, e.g.*, *Division of Oil & Public Safety Confirms Reports of Contaminated Fuel Across the Metro Area*, Colo. Div. of Oil & Pub. Safety (last visited Jan. 13, 2026), https://ops.colorado.gov/news-article/division-of-oil-public-safety-confirms-reports-of-contaminated-fuel-across-the-metro; Steve Staeger, Anna Hewson & Angela Case, *MAP: Here's*

investigation and discovery, this Complaint is likely to be amended to include additional plaintiffs who purchased contaminated fuel from these other retailers, and that these other retailers will become additional defendants.

10. By midday on January 9, 2026, the Colorado Division of Oil and Public Safety (the "Division") had recorded over 200 separate complaints from drivers about contaminated fuel.[4] Many of these drivers described that their vehicles had run briefly after fueling before beginning to sputter, hesitate, misfire, or lose acceleration. Many drivers reported that their vehicles required towing to auto repair shops or dealerships after the vehicles became unsafe or inoperable.[5] And for some of these drivers, diagnostic testing confirmed that their vehicles had been affected by diesel contamination.[6]

6. State inspectors conducted field tests and confirmed the presence of diesel in unleaded gasoline tanks at multiple Costco stations in Sheridan and Superior, Colorado. The Division has continued its investigation, stating that it will work with station owners to test fuel samples to identify additional retailers that sold contaminated fuel.[7]

7. As of January 15, 2026, the Division had received more than 600 complaints and is continuing to process new claims as they are made.

---

*a List of Colorado Gas Stations that May Have Received Contaminated Fuel*, 9News (last updated Jan. 16, 2026, at 9:56 a.m. MT), https://www.9news.com/article/news/local/colorado-news/list-colorado-gas-stations-received-contaminated-fuel/73-babeb4e6-56ee-443c-bad1-aa7e9a033718.

[4] Garrison, *supra* note 2.

[5] *See, e.g.*, Rhea Jha, *Drivers Still Left Without Cars After Fuel Mix-Up in Colorado Causes Costly Damages*, 9News (last updated Jan. 10, 2026, at 6:36 p.m. MT), https://www.9news.com/article/money/consumer/drivers-still-left-without-cars-after-fuel-mix-up-in-colorado-causes-costly-damages/73-19b28635-cffe-4db7-8073-ed905659efa0.

[6] *Id.*

[7] *See* Colo. Div. of Oil & Pub. Safety, *supra* note 3.

8. Gas-powered vehicles are not designed to operate using diesel fuel or fuel contaminated with diesel. Even small amounts of diesel mixed into unleaded gasoline can cause immediate drivability issues, injector fouling, fuel system damage, and catastrophic engine failure, consistent with the information provided in the complaints made to the Division.

9. Damage to vehicles resulting from the use of diesel fuel or fuel contaminated with diesel can result in economic losses including but not limited to repair costs, ranging from several hundred to several thousand dollars, and in addition, economic losses resulting from the time spent dealing with the problem, as well as additional mileage resulting from transporting vehicles to repair shops. Damage can also include diminution of value to the vehicles themselves as a result of being contaminated by diesel.

10. In this instance, Defendants obviously acted negligently and recklessly, and failed to implement reasonable quality control, inspection, testing, oversight, supervision, and monitoring procedures to prevent fuel contamination, and also failed to timely warn consumers once contamination occurred.

11. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class suffered economic losses, including but not limited to engine damage, engine failure, repairs, and diminution of value, as well as the consequential economic damages incurred in dealing with all of these issues.

12. Plaintiff, individually and on behalf of the Class, therefore seeks all available compensatory and statutory damages, economic losses, consequential damages, injunctive relief, attorneys' fees and costs, and all other relief available under Colorado law.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d). The matter in controversy in this class action exceeds $5,000,000.00 exclusive of interest and costs, and Plaintiff and members of the Class are citizens of a state other than the state in which at least one Defendant is incorporated and has its primary place of business.

14. Venue is proper pursuant to 28 U.S.C. §1391(b) because: (a) a substantial part of the events giving rise to this action occurred in this District; and (b) the property that is the subject of this action is located in this District.

15. As a result of Defendants distributing contaminated gasoline throughout Colorado, either directly or indirectly through third parties or related entities, Defendants obtained the benefits of the laws of Colorado and profited from Colorado commerce.

16. Defendants conduct systematic and continuous business activities throughout the State of Colorado and otherwise intentionally availed themselves of the market in Colorado through the promotion, marketing, and sale of its contaminated gasoline.

## PARTIES

17. Plaintiff Lindsey DeHart ("Plaintiff") is a Colorado resident who purchased unleaded plus grade gasoline from Defendant King Sooper's fuel station in Castle Rock, Colorado during the relevant time period and suffered engine damage as a result of contaminated fuel originally distributed in Colorado by Defendant Sinclair.

11. Defendant Dillon Companies, LLC d/b/a King Soopers Fuel Center, King Soopers, Inc., King Soopers, and City Market ("King Soopers"), is a Kansas limited liability company operating grocery stores and branded fuel stations throughout Colorado. King Soopers' principal place of business in Colorado is located at 65 Tejon Street, Denver, CO 80223.

12. Defendant HF Sinclair Oil Corporation ("Sinclair") is a Delaware corporation distributing motor fuel and operating convenience stores and branded fuel stations throughout Colorado.

## FACTUAL ALLEGATIONS

13. Beginning on or around the afternoon of January 7, 2026, unleaded gasoline that was contaminated with diesel fuel was loaded from a third-party supplier terminal operated by Defendant Sinclair in Henderson, Colorado, into transport vehicles and subsequently delivered to retailers up and down the Front Range in Colorado.

14. The Retailers, including King Soopers, received deliveries of the contaminated fuel supplied by Sinclair and made it available for sale to motorists as unleaded regular and plus grade gasoline. This contaminated fuel was distributed from approximately the early afternoon on January 7, 2026 to the morning on January 8, 2026.

18. Beginning on or about January 8, 2026, the Division began receiving the first consumer complaints about contaminated fuel from Colorado consumers of gasoline. In these complaints, drivers reported immediate or near-immediate engine problems after purchasing what they believed to be unleaded gasoline, including sputtering, hesitation, loss of power, and engine misfires. Each of these engine problems is consistent with contaminated diesel fuel.

15. On January 8, 2026, at approximately 10:00 a.m. MT, a Division inspector visited a Costco gas station in Sheridan, Colorado, and was able to identify through visual inspection that the regular unleaded gasoline being sold at that location was contaminated with diesel.

16. Inspectors also confirmed the presence of diesel in unleaded gasoline tanks at a Costco station in Superior, Colorado later that morning, and industry partners confirmed to the Division that they were aware of the contaminated fuel.

17. The Division continued to receive a high volume of complaints and continued their investigation of the contamination issue throughout the day.

18. By the afternoon of January 9, 2026, the Division had received more than 200 separate complaints from drivers reporting engine problems consistent with contaminated fuel. Many of the affected vehicles required towing (and associated economic costs) to auto repair facilities or dealerships because they had become unsafe or inoperable. For multiple vehicles, auto repair facilities conducted diagnostic testing of fuel drawn from their vehicles and confirmed the presence of diesel in the fuel systems.

19. The Division continued to test fuel and visit gas stations throughout the State of Colorado. From January 10, 2026 through January 11, 2026, the Division notified approximately 3,000 gas station owners across the State about the contamination event and the risks associated with the contaminated fuel.

20. By the afternoon of January 15, 2026, the Division had received more than 600 complaints and has continued to process new complaints. Various Retailers have confirmed to news organizations that at least some of their stations received contaminated fuel. Several Costco stations and multiple Sinclair locations also received contaminated fuel.[8]

21. Division officials indicated that they asked Sinclair to provide a full list of retailers that received contaminated fuel. Sinclair has since provided a list of 46 gas stations in 11 Colorado counties that received contaminated fuel.[9]

---

[8] *Division of Oil & Public Safety Update on Contaminated Fuel*, Colo. Div. of Oil & Pub. Safety (last visited Jan. 13, 2026), https://ops.colorado.gov/news-article/division-of-oil-public-safety-update-on-contaminated-fuel.

[9] Olivia Prentzel, *Here Are the 46 Colorado Gas Stations that Received Diesel Instead of Regular Unleaded*, Colo. Sun (Jan. 14, 2026, at 11:29 a.m. MT), https://coloradosun.com/2026/01/14/here-are-the-46-colorado-gas-stations-that-received-diesel-instead-of-regular-unleaded/.

22. Gas-powered vehicles are not designed to operate using diesel fuel or fuel contaminated with diesel. Even small amounts of diesel mixed into unleaded gasoline can cause immediate damage to vehicles because gasoline engines and fuel systems are not designed to meter, atomize, ignite, or combust diesel in the same manner as non-diesel gasoline.

23. When diesel is introduced into a gasoline vehicle's fuel system, it can foul spark plugs and disrupt air-fuel mixture. This can result in sputtering, hesitation, misfiring, loss of acceleration, stalling, and even catastrophic engine failure, especially where a driver has filled a nearly empty tank with diesel fuel.

24. Diesel contamination can also damage the fuel system and related engine-control systems, including fuel pumps, injectors, fuel lines, and filters. This damage can persist even after the vehicle is drained depending on how much diesel entered the tank and how long the engine ran with mixed fuel.

25. At a minimum, the gas tank must be drained and flushed to completely remove all of the diesel and its residue from a gasoline vehicle. This repair alone can cost hundreds of dollars.

26. If the gasoline vehicle was driven with diesel in the gas tank, as was the case for most of the Class, other repairs are often needed, including, without limitation: replacing the spark plugs, serving the fuel injectors and filters, and sometimes even completely replacing the engine. These repairs are substantial and can cost several thousand dollars or more.

27. In light of the substantial mechanical damage and resulting repair costs of using diesel in a gasoline vehicle, diesel pumps are generally labeled in a vibrant green to differentiate them from the pumps for unleaded gasoline. Additionally, a vehicle's gasoline filler neck and the diesel fuel nozzle are designed to be incompatible, meaning that the diesel dispenser is too large to easily fit into a gasoline filler neck.

28. The economic costs incurred by consumers as a result of pumping diesel into non-diesel engines can include, without limitation, mileage charges, towing charges, diagnostic fees, rental car costs, lost wages, and loss of use—particularly where the vehicle is a consumer's only means of personal transportation. Economic costs can also include diminution of value.

29. At approximately 7:15 a.m. on January 8, 2026, Plaintiff purchased what she reasonably believed to be unleaded plus grade gasoline from the King Sooper's station located at 750 N. Ridge Road, Castle Rock, Colorado, 80104.

30. Plaintiff paid $36.72 to fill her 2024 Subaru Outback gasoline powered vehicle with 14.81 gallons of fuel that she reasonably believed was safe and suitable for her vehicle.

31. After filling her vehicle with the fuel, Plaintiff drove her vehicle a short distance home.

32. When Plaintiff attempted to start her vehicle the following morning, on January 9, 2026, the engine struggled to start and began making "chugging" sounds. Plaintiff turned off the vehicle and called a tow truck.

33. The tow truck took Plaintiff's vehicle to the Subaru dealership located at 9955 E. Arapahoe Road, Centennial, Colorado, 80112, where it still sits.

34. On January 26, 2026, the Subaru dealership confirmed sample testing indicated that Plaintiff's gas tank was contaminated with diesel fuel.

35. Because Plaintiff's car cannot be used until necessary repairs are made, Plaintiff was forced to obtain a rental car on January 10, 2026.

36. Defendants owed a duty to consumers to distribute and sell fuel that is fit for its ordinary and intended use.

37. Defendants were responsible for the distribution, handling, receipt, storage, labeling, monitoring, and dispensing of motor fuels at their respective supplier terminals and gas stations.

38. Defendants negligently and recklessly allowed diesel fuel to be distributed to retailers and/or introduced into tanks designated for unleaded regular and plus grade gasoline.

39. Defendants failed to detect the contamination before distributing the fuel to retailers and/or selling the fuel to consumers.

40. Defendants failed to timely shut down affected pumps or warn consumers of the contamination.

41. As a direct and proximate result of Defendants' distribution and sale of contaminated fuel, as set forth above, Plaintiff and the Class have incurred and will continue to incur substantial economic losses, including, without limitation, out-of-pocket expenses for diagnostic testing fees, and engine repairs, and loss-of-use damages and other consequential damages as set forth and described in this Complaint, as well as diminution of value of their vehicles.

## CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of herself and on behalf of the Class and Subclass defined below:

> All individuals who purchased unleaded regular or plus grade gasoline that originated at the HF Sinclair Corporation's Henderson Terminal and which was contaminated with diesel fuel (the "Class").
>
> All individuals who purchased unleaded regular or plus grade gasoline that originated at the HF Sinclair Corporation's Henderson Terminal and which was contaminated with diesel fuel, and was sold at gas stations operated by King Soopers (the "King Soopers Subclass").

43. The Class and Subclass are referred to collectively herein as the "Class." Excluded from the Class are Defendants, their officers and directors, and members of the judiciary.

44. The members of the Class are so numerous that joinder of all members is impracticable. There are thousands of Class members and thousands of Subclass members.

45. Defendants engaged in the same conduct towards Plaintiff and all Class members.

46. The injuries to the Class present questions of law and fact that are common to each Class member and that are common to the Class as a whole.

47. Plaintiff will fairly and adequately represent and protect the interests of the Class because there is no conflict between the claims of Plaintiff and those of the Class, and Plaintiff's claims are typical of the claims of the Class.

48. Plaintiff's undersigned counsel are competent and experienced in litigating class actions and other complex litigation matters, including consumer matters like this one.

49. Class certification is appropriate because questions of law and fact common to the Class predominate over any questions affecting only individual Class members including, without limitation: (1) whether Defendants distributed and/or sold diesel-contaminated gasoline; (2) whether Defendants were negligent in distributing, handling, and selling fuel; (3) whether the fuel was unfit for ordinary use; (4) whether Defendants breached warranties; and (5) whether the Class suffered damages as a result of Defendants' actions.

50. Plaintiff's claims are typical of the claims of the Class in the following ways, without limitation: (a) Plaintiff is a member of the Class; (b) Plaintiff's claims arise out of the same policies, practices, and course of conduct that form the basis of the claims of the Class; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the Class and involve similar factual circumstances; (d) there are no conflicts between the interests of Plaintiff

and the members of the Class; and (e) the injuries suffered by Plaintiff are similar to the injuries suffered by the members of the Class.

51. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class is readily identifiable from Defendants' records. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

52. A class action is superior to other available methods for adjudication of this controversy because joinder of all members is impractical. Further, the amounts at stake for many of the members of the Class, while substantial, are not great enough to enable them to maintain separate suits against Defendants.

53. Without a class action, Defendants will retain the benefit of their wrongdoing, which will result in further damages to Plaintiff and the Class. Plaintiff envisions no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (Against All Defendants on behalf of the Class and Subclass)

54. Plaintiff incorporates by reference each preceding and succeeding paragraph as thought set forth herein.

55. Defendants distribute and sell motor fuel for use in consumers' motor vehicles.

56. Defendants were negligent, and indeed, acted recklessly, in failing to use reasonable care when they distributed and/or sold motor fuel contaminated with diesel to consumers.

57. Defendants' contaminated motor fuel is unreasonably dangerous and destructive when used in motor vehicles that do not tolerate diesel.

58. Defendants owed a duty to the consuming public to ensure their product was reasonably free of defect. Defendants further had the duty to not put defective and dangerous products such as the contaminated motor fuel on the market.

59. At the time Defendants were distributing and/or selling the contaminated motor fuel, Defendants were aware, or reasonably should have been aware, of the foreseeable risks associated with the use of their motor fuel.

60. Defendants were negligent and breached their duty to the consuming public, including Plaintiff and Class members, by selling their contaminated motor fuel that, under ordinary use in a consumer's vehicle, would cause engine malfunction, stalling, loss of power, warning lights, and in some cases, engine failure.

61. The injuries sustained by Plaintiff and Class members could have been reasonably foreseen by Defendants.

62. As a direct and proximate result of Defendants' negligent acts and/or omissions, Plaintiff and Class members have incurred and will incur damages in an amount to be proven at trial.

63. Defendants' negligence was the direct and proximate cause of Plaintiff and the Class members' damages.

64. Plaintiff and Class members suffered actual damages recoverable under Colorado law.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (Against All Defendants on behalf of the Class and Subclass)

50. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

51. Defendants distributed or sold motor fuel knowing that they would be used in consumers' vehicles.

52. Defendants were distributors and/or merchants of motor fuel and distributed the motor fuel into the stream of commerce and/or marketed, promoted, and sold the motor fuel to the consuming public.

53. Defendants expected the consuming public, including Plaintiff, to use the motor fuel in their vehicles and such use was reasonably foreseeable. The motor fuel distributed and/or sold by Defendants was not merchantable at the time Defendants sold them.

54. At all relevant times, Defendants were distributors and/or merchants with respect to motor fuel and impliedly warranted that the motor fuel was of a quality that would pass without objection in the trade and was fit for the ordinary purposes for which such goods are used, and in all other respects was of merchantable quality.

55. Plaintiff relied on those warranties.

56. Defendants breached their implied warranty of merchantability because the motor fuel was not of merchantable quality and was unfit for the ordinary purposes for which it was designed and was used.

57. Given the necessity of motor fuel in running Plaintiff and Class members' motor vehicles, any limitation of remedies claimed by Defendants must fail of its essential purpose in that significant damage to property has occurred and that repair of damages cannot be accomplished without considerable consequential cost and expense.

58. As a result of Defendants' breach of their implied warranties, Plaintiff and the Class members have suffered actual damages, in that they have purchased and used motor fuel in their motor vehicles that are defective and not suitable for their intended purpose. These defects have caused and will continue to cause Plaintiff and the Class members to expend substantial time, resources, and economic costs in repairing their vehicles, removing and/or cleaning out their fuel tanks, and addressing any collateral or consequential damages to their motor vehicles proximately caused by the defective motor fuel.

59. Plaintiff and the Class seek all damages available by statute or law.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF**
**FITNESS FOR A PARTICULAR PURPOSE**
**(Against Defendant King Sooper on behalf of the Subclass)**

61. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

62. Defendant King Soopers sold and impliedly warranted the motor fuel to be fit for the purpose of use to fuel a motor vehicle.

63. The motor fuel was not suitable for the purpose because it was contaminated with diesel that could not be used in Plaintiff and Subclass members' motor vehicles.

64. Plaintiff used the motor fuel in the manner in which it was intended to be used, namely as fuel for the purpose of powering and operating their motor vehicles. This use was reasonably expected by and foreseeable to Defendant King Sooper.

65. Plaintiff relied on Defendant King Sooper's skill and/or judgment when choosing its product for use in their motor vehicles.

66. Given the significance of the motor fuel to the operation of Plaintiff's motor vehicles, any limitation of remedies claimed by Defendant King Soopers must fail of its essential purpose in that significant damage to property has and will continue to occur and the reparation of such damages cannot be accomplished without considerable consequential cost and expense.

67. As a result of Defendant King Sooper's breach of its implied warranties, Plaintiff and the Subclass members have suffered actual damages, in that they have purchased and used the defective motor fuel which was not at all suitable for its intended purpose. These defects have caused and will continue to cause Plaintiff and the Subclass to expend substantial time, resources, and economic costs in removing the defective motor fuel and addressing any collateral damages to their motor vehicles proximately caused by the defective motor fuel.

**COUNT IV**
**COLORADO CONSUMER PROTECTION ACT (C.R.S. § 6-1-101, *et seq.*)**
**(Against All Defendants on behalf of the Class and Subclass)**

69. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

70. The Colorado Consumer Protection Act, C.R.S. § 6-1-105, states:

(1) A person engages in a deceptive trade practice when, in the course of the person's business, vocations, or occupation, the person:

> . . .
>
> (e) Knowingly makes false representations as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;
>
> . . .
>
> (g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if he knows or should know that they are of another;
>
> . . .
>
> (u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

71. Defendants actively and knowingly misrepresented to and/or omitted from Plaintiff and Class members at the time of distribution or purchase of the motor fuel and thereafter, the ingredients, alterations, quality, and/or grade of the motor fuel, and represented that the motor fuel was merchantable and was not defective.

72. When the motor fuel left Defendants' control, Defendants knew or should have known that it was in defective and dangerous condition and would not perform as warranted by Defendants.

73. Defendants' warranty and representations that the motor fuel was safe and free from defects would influence a reasonable consumer's decision whether to purchase the motor fuel.

74. Defendants' failure to warn of the defective nature of the motor fuel was a material omission that would influence a reasonable consumer's decision whether to purchase the motor fuel.

75. Defendants engaged in unfair and deceptive trade practices in violation of C.R.S. § 6-1-105(1), including but not limited to:

a) Knowingly or negligently passing off contaminated fuel as unleaded gasoline, C.R.S. § 6-1-105(1)(e);

b) Representing that fuel was of a particular standard, quality, or grade when it was not, C.R.S. § 6-1-105(1)(g);

c) Failing to disclose material facts regarding fuel contamination, C.R.S. § 6-1-105(1)(g).

Defendants failed to disclose to Plaintiff and Class members and/or actively concealed from them that the motor fuel was and is defective, amounting to a deceptive trade practice under the Colorado Consumer Protection Act.

76. Plaintiff and the Class relied on the truth of Defendants' warranties and representations concerning the motor fuel, were deceived by warranties and representations, and suffered damages as a result of this reliance and deception.

77. Defendants' conduct significantly impacted the public as actual or potential consumers of motor fuel in Colorado because:

a) Defendant Sinclair distributes fuel to retailers across the state of Colorado;

b) Defendants operate hundreds of fuel dispensers statewide and sell gasoline to thousands of Colorado motorists daily;

c) Fuel contamination events affected numerous consumers simultaneously at multiple locations;

d) The sale of contaminated fuel posed an immediate risk of widespread engine failure and public safety hazards;

e) Individual consumers lack the ability to detect fuel contamination at the point of sale; and

f) Defendants' practices have the potential to recur absent judicial intervention.

77. Had Plaintiff and Class members been adequately warned about the fact that the motor fuel was contaminated with diesel fuel, they would have taken steps to avoid damages.

78. As a direct and proximate result of Defendants' false representations, Plaintiff and the Class members have suffered an injury in fact to a legally protected interest, including monetary losses and property interests, as a direct result of Defendants' deceptive practices.

79. Defendants' violations were willful, entitling Plaintiff and Class members to treble damages under C.R.S. § 6-1-113(2)(a).

**COUNT V**
**UNJUST ENRICHMENT**
**(Against All Defendants on behalf of the Class and Subclass)**

80. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

81. Substantial benefits have been conferred on the Defendants by Plaintiff and Class members by purchasing the motor fuel, and Defendants have knowingly and willingly accepted and enjoyed these benefits.

82. Defendants either knew or should have known that the payments rendered by Plaintiff and the Class members were given and received with the expectation that the motor fuel would perform as represented and warranted. For Defendants to retain the benefit of the payments under these circumstances is inequitable.

83. Defendants' acceptance and retention of those benefits under the circumstances make it inequitable for Defendants to retain the benefit without payment of the value to the Plaintiff and the Class members.

84. Plaintiff and the Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

85. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff and the Class members are entitled to an accounting, restitution from, and

institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants, plus attorneys' fees, costs, and interest thereon.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Class, respectfully request that the Court grant the following relief:

A. Enter an Order certifying the proposed Class and Subclass, appointing Plaintiff as Class Representative of the Class and Subclass, and appointing the undersigned counsel as Class Counsel;

B. Declare that Defendants must notify all Class members of the problems with the motor fuel;

C. Enter an award to Plaintiff and the Class that includes all actual, compensatory, consequential, ancillary, statutory, exemplary, punitive, and other damages allowed by Colorado law or other law, statutory damages and penalties, including interest thereon, in an amount to be proven at trial;

D. Declare that Defendants must account for and disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of their motor fuel, or order Defendants to make full restitution to Plaintiff and members of the Class;

E. Award pre-judgment and post-judgment interest at the maximum rate allowable by the law;

F. Award reasonable attorneys' fees and reimbursement of costs incurred by Plaintiff and their counsel in connection with this action; and

G. Award such other and further injunctive relief, including ongoing monitoring of Defendants' fuel operations, as the Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of herself and the members of the proposed Class and Subclass, hereby demands a trial by jury on all issues so triable.

Dated: January 27, 2026

Respectfully submitted,

*/s/ Alexandra K. Piazza*
Alexandra K. Piazza
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Telephone: (215) 875-3063
Facsimile: (215) 875-4620
apiazza@bergermontague.com

Shanon J. Carson
Justin D. Cole*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bergermontague.com
jcole@bergermontague.com

Soledad Slowing-Romero*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 474-4230
sslowingromero@bergermontague.com

*Motions for admission forthcoming.

*Counsel for Plaintiff and the Proposed Class*